# COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

March 27, 2025

Dean A. Campbell, Esquire
Law Office of Dean A. Campbell, PA
703 Chestnut Street
Milton, Delaware 19968

  RE: *In re the Matter of the Estate of Betty Kay Kalisty*,
    C.A. No. 2021-0755-LWW

Dear Counsel:

The petitioner is the executor of the estates of a deceased married couple. He seeks to enforce their joint will. No signed version of the will has been located and the draft version submitted to the court is invalid. The couple's property, which is unclaimed by their family, therefore escheats to the state.

## I. BACKGROUND

The following facts are not subject to dispute or were proven by a preponderance of the evidence at an October 11, 2024 evidentiary hearing.[1]

---

[1] The petitioner's exhibits are cited as "PX __." Testimony from the evidentiary hearing is cited as "[Witness Name] Tr. __." *See* Dkt. 24.

## A.    Execution of the Purported Joint Will

Walter and Betty Kalisty—both now deceased—were a married couple who resided in Clayton, Delaware.  Walter had children and grandchildren from a prior marriage.  Betty had no children.

In July 2000, Walter and Betty drafted a joint "Last Will and Testament."[2] They named petitioner David D. Hansen as executor of their estates.[3]  Hansen was a friend of the couple and former colleague of Walter.[4]

The will provided bequests of $1,000 each to two of Walter's grandchildren, after which the estate would be distributed in two one-third shares to each of Walter's daughters and two one-sixth shares to each of Walter's sisters.[5]  It

---

[2] PX B ("Draft Will").  I refer to Walter and Betty Kalisty by their first names to avoid confusion.  No disrespect is intended.

[3] *Id.* at 1.

[4] Hansen Tr. 5-6.

[5] Draft Will 2-3.  Each of the allocated portions were to be put in an interest-bearing trust with withdrawals limited to $5,000 per year.  *Id.*  If any of the four beneficiaries disclaimed her share, the remaining beneficiaries' shares would be correspondingly increased.  *Id.* at 3.  But if all four beneficiaries disclaimed their shares, one-quarter of the remainder would be allocated to each of Walter's grandchildren, with the rest donated to the Salvation Army and the Girls and Boys Town USA.  *Id.*

disclaimed any benefit to Walter's ex-wife (the mother of his daughters).[6] Betty had no known living family members; none were named as beneficiaries.[7]

The will included a "[d]eclaration of joint ownership" stating that "all assets of the parties, real or otherwise, [were] jointly owned," and that "[u]pon death of either [spouse], joint ownership [would] revert to full ownership by the surviving spouse."[8] This clause would ensure that Betty could remain in the marital home if Walter predeceased her.[9]

On several occasions, Hansen discussed the will with Walter and Betty.[10] Walter gave Hansen an unsigned copy of the will and told him that the original version would be signed, notarized, placed in a sealed envelope in a metal box under Walter's desk.[11] But Hansen neither witnessed the execution of the will nor ever saw a signed copy.[12]

---

[6] Draft Will 3; *see* Hansen Tr. 7.

[7] *See* Hansen Tr. 7-8 (testifying that he was unable to locate any living family members of Betty).

[8] Draft Will 1.

[9] *See* Hansen Tr. 11. According to Hansen, Betty "was very fearful of [Walter] dying first, and then his children . . . attempt[ing] to take the house from her." *Id.*

[10] *Id.* at 11, 24.

[11] *Id.* at 11-12.

[12] *Id.* at 10.

### B. Walter's Death

Walter died on October 9, 2014.[13] Hansen did not open an estate at that time because he believed that the Kalistys' joint will was valid and would go into effect upon Betty's death.[14]

Betty remained in the marital home.[15] Hansen continued to visit her periodically, as he had promised Walter he would do.[16] In time, these visits took place on Betty's porch because she would not let Hansen inside the house.[17] Hansen later discovered that Betty had filled the house with "debris in every room."[18] Still, Hansen did not observe any significant change in Betty's mental state or believe the status of the will had changed.[19] His discussions of the will with Betty were few, and they were limited to him assuring her that Walter's heirs could not taking the house from her—an outcome she feared.[20]

---

[13] *See id.* at 12; PX E.

[14] *See* Pet. to Authorize Sale and Instruction (Dkt. 1) ("Pet.") ¶ 13.

[15] Hansen Tr. 13.

[16] *Id.* at 13-14.

[17] *Id.* at 13.

[18] *Id.* at 14.

[19] *Id.* at 14, 16.

[20] *Id.* at 15-16; *see supra* note 9 and accompanying text.

#### C. Betty's Death and Estate Administration

Betty died on January 17, 2020.[21]

Due to the chaotic state of the Kalistys' home, it took Hansen a month to locate the metal box in which Walter said he would keep the will.[22]  But the will was not in the box.[23]  After making an "earnest effort to look at every single piece of paper" in the house, Hansen eventually located the sealed envelope that had contained the original will, along with a list of assets.[24]  The will was not in the envelope; it was nowhere to be found.[25]

Hansen was appointed the administrator of Betty's estate upon her death.[26]  In that capacity, he filed with the Register of Wills an inventory in June 2020 of the Kalistys' remaining assets to be distributed, including real property then worth an estimated $216,000 and cash and other property worth $13,382.32.[27]

---

[21] PX C at 1.

[22] *Id.* at 13.

[23] *Id.* at 16.

[24] *Id.* at 17.

[25] *Id.*

[26] *Id.*

[27] PX C at 7; *see also* Pet. ¶ 21.

### D.    This Litigation

On September 2, 2021, Hansen filed a petition in this court seeking two forms of relief.[28]  First, he asked for permission to sell the Kalistys' marital home.[29] Approximately $5,500 remained of the Kalistys' personal assets after payments to the Register of Wills and of bills for the home, as well as expenditures to make the house marketable for sale.[30]  I granted Hansen permission to sell the house and to deposit the sale proceeds in an estate account to pay the expenses of the estate.[31]  On January 25, 2023, Hansen sold the property, netting $144,632.52 for the estate.[32]

Second, Hansen requested instruction from the court on the distribution of the estate.[33]  He asserted that "Walter and Betty . . . had an agreement, or at a minimum

---

[28] Dkt. 1.

[29] Pet. ¶¶ 19-23.

[30] *Id.* ¶ 21.  As of the evidentiary hearing, the value of this personal property was exhausted from administrative expenses and attorneys' fees, leaving the real property as the only asset.  Pet'r's Opening Post-Hr'g Br. (Dkt. 26) 11.

[31] Dkt. 13.

[32] Pet'r's Opening Post-Hr'g Br. 5; Hansen Tr. 17; PX D at 1.  The $144,632.52 figure presented at the evidentiary hearing differs from that listed in petitioner's briefing: $153,904.62.  Petitioner's exhibit D, which is the settlement statement documenting the sale of the marital home, enables me to reconcile these numbers.  The contract price was $149,000, on top of which the borrower was required to pay settlement charges equal to $4,576 and county taxes equal to $328.62, for a total of $153,904.62.  PX D at 1.  The seller's estate received the $149,000, less its own settlement charges of $4,698.10, for a total of $144,632.52.  *Id.*

[33] Pet. ¶¶ 24-29.

an understanding, that their combined estate would pass to Walter's next-of-kin upon both of their deaths."[34] "As a result of Walter's death occurring first and Betty's loss or intentional destruction of the [w]ill," however, "their agreement could not be finalized."[35]

An evidentiary hearing on the request for instruction took place on October 11, 2024.[36] Hansen was the only testifying witness. None of Walter's kin— including the purported beneficiaries of the estate—attended or otherwise appeared in this action, despite having notice of it.[37] A representative from the Delaware Department of Finance, Office of Unclaimed Property, appeared because Betty's remaining assets would escheat to the state if the will was deemed invalid.[38] In a subsequent letter, the Office of Unclaimed Property said that it took no position on how the assets should be distributed.[39]

---

[34] *Id.* ¶ 26.

[35] *Id.*

[36] Dkts. 24-25.

[37] Hansen Tr. 21-22.

[38] 12 *Del. C.* § 1101 ("If any person, being at the time of death seized or possessed of any real or personal estate within this State, dies intestate, without heirs or any known kindred who can inherit and hold the intestate's estate, such estate is escheat to the State, subject to all legal demands on the same.").

[39] Dkt. 28 ("OUP Letter").

## II. ANALYSIS

Delaware law requires that a will be signed by the testator and attested to by at least two credible witnesses.[40] The only version of the Kalistys' will in evidence does not meet either requirement.[41] The will is therefore "void."[42]

Hansen advances two alternative grounds for enforcing the will in substance despite these deficiencies. First, he argues that because "both Walter and Betty were of the belief and understanding that the document would constitute a valid will," the court should exercise its equitable power to reform the will to rectify their "mutual

---

[40] 12 *Del. C.* § 202; *see also* Pet'r's Opening Post-Hr'g Br. 9. The statute's reference to the "testator" in the singular also casts some doubt on whether a joint will, such as the one prepared by the Kalistys, is valid. 12 *Del. C.* § 202(a). The more common practice is for spouses to each execute identical "reciprocal" wills pledging to leave the estate to the surviving spouse. *See, e.g.*, *In re Estate of Justison*, 2005 WL 217035, at *1 (Del. Ch. Jan. 21, 2005); *Norton v. Norton*, 672 A.2d 53, 54 (Del. 1996); *Shuttleworth v. Abramo*, 1993 WL 330054, at *2 (Del. Ch. Aug. 12, 1993). In the few occasions where the Court of Chancery has encountered joint wills, it interpreted the text of the will without declaring the will to be presumptively invalid. *See Anthony v. Harris*, 100 A.2d 229, 232-33 (Del. Ch. 1953); *Brand v. Faries*, 178 A. 583, 583-84 (Del. Ch. 1935). Other states have found joint wills valid. *See, e.g.*, *Schloss v. Koslow*, 800 N.Y.S.2d 715, 717 (N.Y. App. Div. 2005); *In re Estate of Erickson*, 841 N.E.2d 1104, 1106 (Ill. App. Ct. 2006). Because the will in question here does not meet the statutory specifications, I need not resolve whether joint wills are valid under Delaware law.

[41] Pet'r's Opening Post-Hr'g Br. 11.

[42] 12 *Del. C.* § 202(b) ("Any will not complying with subsection (a) of this section shall be void.").

mistake of fact."[43]  Second, he argues that the Kalistys' intent should be enforced as an oral contract to make a will.[44]

Hansen has nobly advocated for his deceased friends, despite the apparent disinterest of Walter's children in the estate.  Unfortunately, however, neither of his legal arguments supports enforcement of the unsigned will.

### A.    Mutual Mistake

Hansen asserts that the unsigned document in his possession should be reformed under the doctrine of mutual mistake because Walter and Betty mistakenly believed they were entering into a valid will.[45]  "A party seeking reformation must prove three elements by clear and convincing evidence: (1) that the party was mistaken about the contents of the final, written agreement; (2) that either its counterparty was similarly mistaken or that the counterparty knew of the mistake but remained silent so as to take advantage of the error; and (3) that there was a specific meeting of the minds regarding a term that was not accurately reflected in the final written agreement."[46]  "Mutual mistake occurs when both parties were

---

[43] Pet'r's Opening Post-Hr'g Br. 11-12.

[44] *Id.* at 12.

[45] *Id.* at 11.

[46] *In re 11 W. P'rs, LLC*, 2019 WL 1300859, at *5 (Del. Ch. Mar. 20, 2018).

mistaken as to a material portion of the written agreement, or when both parties are under substantially the same erroneous belief as to the facts."[47]

The doctrine is inapplicable here for two reasons.

First, there is no evidence that Walter and Betty were mistaken as to the *language* of the will. Put differently, it is not clear what terms I could modify to effectuate the parties' intent. I cannot modify the document to add the signatures or witnesses required for a valid will to exist under Delaware law.

Second, Hansen's argument hinges on Walter and Betty's mutual understanding of the will. Though Hansen credibly testified to the Kalistys' views on the will at the time it was written,[48] it is unknown whether the will was ever executed. It is also unknown whether Betty intended for it to be enforced after her death.

"A missing will, last in possession of the testator, is presumed to have been discarded or intentionally destroyed with the intent that it be revoked."[49] To overcome this presumption, "the party attempting to establish the validity of a missing will must demonstrate 1) that a valid will was executed by the decedent;

---

[47] *CC Fin. LLC v. Wireless Prop., LLC*, 2012 WL 4862337, at *7 (Del. Ch. Oct. 1, 2012) (citation omitted); *see also* Restatement (Second) of Contracts § 155 (1981).

[48] *See supra* note 29 and accompanying text.

[49] *In re Wilson Est.*, 1999 WL 504783, at *1 (Del. Ch. July 13, 1999) (ORDER).

2) the terms of the missing will; and 3) that the will was lost or unintentionally destroyed and that the decedent's testamentary intent was not altered prior to her death."[50] The first and third elements are unproven.

If anything, the record gives reason to suspect that Betty may have destroyed the will. Hansen testified that Betty was paranoid about Walter's heirs taking the house from her both during and after his death,[51] suggesting that her relationship with Walter's heirs was less than sanguine. Hansen's brief suggests that Betty failed to "maintain[] the original document or otherwise ensur[e] that her promise to Walter was carried out."[52] Perhaps Walter and Betty had different goals for the estate.[53]

Thus, I cannot find that Walter and Betty were mutually mistaken. I decline Hansen's invitation to reform the unsigned joint will.

---

[50] *Id.*

[51] *See supra* notes 9, 20, and accompanying text; *see also* Pet. ¶ 15 ("More importantly, after Walter's death Betty became increasingly paranoid and believed Walter's [n]ext-of-[k]in would try to take everything from her during her lifetime, including but not limited to the marital home.").

[52] Pet'r's Opening Post-Trial Br. 14.

[53] *See id.* at 7 ("Betty's concern was that Walter's children would attempt to take the house if he died first and she wanted to make sure she had a place to live. Walter's concern, of course, was to make sure his estate passed to his children and grandchildren."); *id.* at 13 ("Walter, who had heirs, wanted the [f]uture [i]nterest in the estate to pass to his heirs. Because Betty had no family, she agreed, so long as she had a place to live for the remainder of her life.").

### B.  Oral Contract to Make a Will

Hansen next contends that I should enforce the parties' oral contract to make a will.[54]  "Although Delaware recognizes the validity and enforceability of an oral contract to make a will, the law views those agreements with skepticism."[55]  "[A] party seeking to specifically enforce an oral agreement to make a will must meet a heightened burden of proof . . . because the testator never will be able to present his version of events, creating an increased risk of fabrication."[56]  As discussed above, it is unknown whether Betty intended to preserve the will after her death.[57]

Moreover, Delaware courts recognize the validity of an oral promise to make a will under an exception to the Statute of Frauds if "there has been a showing of part performance of a services contract in reliance on such oral contract."[58]  To satisfy this exception, the act of partial performance "should be such as would not have been done independent of [the] contract or agreement."[59]

---

[54] Pet'r's Opening Post-Trial Br. 12.

[55] *McCloskey v. McCloskey*, 2014 WL 1824712, at *7 (Del. Ch. Apr. 24, 2014).

[56] *Id.*

[57] *See supra* notes 51-52 and accompanying text.

[58] *Boush v. Hodges*, 1996 WL 652762, at *6 (Del. Ch. Nov. 6, 1996).

[59] *Sargent v. Schneller*, 2005 WL 1863382, at *4-5 (Del. Ch. Aug. 2, 2005) (citation omitted).

The lone evidence of partial performance after Walter's death is Betty's continued residency in the marital home.[60] But Delaware law recognizes that real property "conveyed to husband and wife, without specifying the estate created, create[s] a tenancy by the entireties."[61] And "[w]hen husband and wife hold property as tenants by the entirety, upon [the] death of one spouse, the surviving spouse's whole interest in the property continues."[62] By operation of law, Betty would have been entitled to remain in the marital home regardless of whether the will was valid or effective.

Because Betty's continued residency would have occurred "independent of [the will],"[63] the partial performance exception is unmet. I cannot conclude that a valid oral promise to make a will was made.

## III.   CONCLUSION

The joint unsigned will of Walter and Betty Kalisty is void as a matter of Delaware law. It cannot be enforced under the doctrine of mutual mistake or as an

---

[60] *See supra* note 15 and accompanying text.

[61] *Henderson v. Chantry*, 2002 WL 244692, at *3 (Del. Ch. Feb. 5, 2002); *see also Fischer v. Fischer*, 864 A.2d 98, 101 (Del. Ch. 2005).

[62] *Fischer*, 864 A.2d at 107.

[63] *See supra* note 59 and accompanying text.

oral contract to create a will.  What remains of the estate—the proceeds from the

sale of the marital home—must escheat to the State of Delaware.[64]

  IT IS SO ORDERED.

          Sincerely yours,

          /s/ *Lori W. Will*

          Lori W. Will
          Vice Chancellor

cc:  Rebecca Song, Esquire

---

[64] *See supra* note 38 (explaining the statutory rule regarding escheatment).  In its letter to the court, the Office of Unclaimed Property noted that "[a] fundamental public policy underlying modern unclaimed property or custodial escheat law [of] return[ing] property to the correct owner or to the heirs if the owner is deceased . . . would likely be frustrated by the technicalities of this case, should the Court determine that the property escheats to the State."  OUP Letter 1.  But, as explained above, even putting aside the purported will's noncompliance with Delaware's legal requirements, the record leaves unclear whether Betty viewed Walter's heirs as the "correct owners" of the assets in question.